UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

Plaintiff,

v.

STEVEN MITCHELL GANT,

Defendant.

**Criminal No. 18-117 (MJD/LIB)**
**REPORT AND RECOMMENDATION**

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment made in accordance with the provision of 28 U.S.C. § 636, and upon Defendant Steven Mitchell Gant's ("Defendant") Motion to Dismiss Indictment, [Docket No. 24], and Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25]. On July 16, 2018, the Court held a Motions Hearing on Defendant's pretrial motions.[1] At the Motions Hearing, the parties requested the opportunity to submit supplemental briefing, which was completed August 28, 2018, and after which Defendant's Motion to Dismiss Indictment, [Docket No. 24], and Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], were taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Motion to Dismiss Indictment, [Docket No. 24], and Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], both be **DENIED**.

---

[1] The Court addressed Defendant's pretrial motions for discovery and production of evidence by separate Order. [Docket No. 33].

I.      **BACKGROUND AND STATEMENT OF FACTS**

    **A.  Background**

Defendant is charged with one count of conspiracy to distribute and two counts of the distribution of heroin, in violation of 18 U.S.C. §§ 841(a)(1), 841(b)(1)(B), (b)(1)(C), 846, and 853. (Indictment [Docket No. 1]).

    **B.  Facts**

The record presently before the Court indicates that on February 20, 2018, Defendant was arrested pursuant to a federal arrest warrant, and he was transported to the Becker County Sheriff's Department. (Gov't Ex. 1 0:00–3:00).[2] Defendant was arrested after a confidential informant bought heroin from him on February 15, 2018, and again on February 20, 2018. (July 16, 2018, Motions Hearing, Digital Recording at 2:45–2:47 p.m.). Upon arriving at the Becker County Sheriff's Department, Defendant was placed in a solitary holding cell. (Id. at 2:59–3:00 p.m.).

Special Agent Dan Skoog (hereinafter "SA Skoog") began his first interview of Defendant at around 12:30 a.m., on February 21, 2018, approximately two hours after Defendant arrived at the Becker County Sheriff's Department. (Id. at 2:55–2:56 p.m.). SA Skoog recorded the interview, but he did not inform Defendant he was recording. (Id. at 3:04–3:05 p.m.). SA Skoog testified that, at the time of the interview, he and Special Agent Chris Larson (hereinafter "SA Larson") had their handguns on them and they were visible, but the handguns were never removed from their holsters. (Id. at 3:05–3:07 p.m.). SA Skoog further testified that he was in normal street clothes, although he could not recall exactly what he was wearing. (Id. at 3:37–3:38 p.m.).

_____

[2] Government's Exhibits 1 and 3 are CD audio recordings of the two February 21, 2018, interviews. At the Motions Hearing, the Government, without objection, offered the CD audio recordings into evidence as Government's Exhibit 1 and 3. (July 16, 2018, Motions Hearing, Digital Recording at 2:45–2:47 p.m., 3:18–3:21 p.m.).

At some unspecified time, the jail staff told SA Skoog that the water was shut off to Defendant's cell. (Id. at 3:42–3:46 p.m.). SA Skoog did not recall whether or not he told the jail staff to shut off the water, but he testified that if he did, it would have only been temporary, so the jail staff could search Defendant for any drugs hidden on his person. (Id. at 3:46–3:48 p.m.). At some other unspecified point in time, SA Skoog was informed by the jail staff that the water to Defendant's cell had been turned back on. (Id. at 3:50–3:52 p.m.). Defendant testified that he asked the jail staff to turn on the water, and he told them he was hungry. (Id. at 3:50–3:52 p.m.).

SA Skoog also testified that he had no issues understanding Defendant, that Defendant responded appropriately to questions asked, that Defendant appeared physically normal, that Defendant did not appear to be under the influence of alcohol, and that Defendant seemed psychologically fine without any indication of mental health disabilities. (Id. at 3:07–3:08 p.m.). Defendant informed the officers that he had used marijuana at some point earlier in the day, but SA Skoog did not think it affected Defendant's ability to ask and answer questions during the interview. (Id. at 3:07–3:09 p.m., 3:53–3:55 p.m.).

SA Skoog began the first interview by reading Defendant his Miranda[3] rights. (Gov't Ex. 1 0:00–3:00). After informing Defendant of his right pursuant Miranda, the following exchange took place:

| | |
|---|---|
| SA Skoog: | Do you understand each of these rights as I've explained them to you? |
| Defendant: | Ah-huh. |
| SA Skoog: | What's that? |
| Defendant: | Yeah. |
| SA Skoog: | Okay. Have these rights in mind, are you willing to talk to us right now? |

---

[3] Miranda v. Arizona, 384 U.S. 436, 444 (1966).

| | |
|---|---|
| Defendant: | Man, I don't even know why I'm here. |
| SA Skoog: | Well and that's what I can explain to you. |
| Defendant: | Yeah, I'll – I mean I guess we can talk, I guess. |

(<u>Id.</u> at 4:00–4:15).

After the above exchange, Defendant asked SA Skoog and SA Larson who they were and they identified themselves. (<u>Id.</u> at 4:15–4:40). The officers then began discussing various topics with Defendant, including who Defendant had been working with; Defendant's criminal history; his recent travel; and who was in the vehicle with him at the time of his arrest. (<u>Id.</u> at 4:50–12:15).

SA Skoog and SA Larson then briefly began discussing Defendant's recent drug transactions with Defendant. (<u>Id.</u> at 12:15–12:45). The officers informed Defendant that they had bought heroin from him on numerous occasions. (<u>Id.</u> at 12:45–13:10). The officers then told Defendant that, thus far, they knew he was lying to them. (<u>Id.</u> at 12:45–13:10). The conversation was as follows:

| | |
|---|---|
| SA Skoog: | We wanted to judge your cooperation |
| Defendant: | Uh-huh. |
| SA Skoog: | Your truthfulness and, quite frankly, you haven't been truthful right now, completely. You've been selling heroin and lots of it. Um, we've bought heroin from you numerous times. |
| Defendant: | How? When? |
| SA Skoog: | How? When? Several times, okay? Uh. |
| Defendant: | Since when though? |
| SA Skoog: | Huh? |
| Defendant: | Tell me, tell me since the last I been up here. |
| SA Skoog: | Uh, just, you were up her last, end of last week. |

4

| | |
|---|---|
| SA Larson; | You were up here tonight |
| SA Skoog: | You were up here tonight |
| SA Larson: | You were up here last week. |
| Defendant: | At the end of last week |
| SA Larson: | The few weeks before that. |
| SA Skoog: | Yeah. You've been up here the last few weeks a lot. Almost every day. Um, I know you got a big source of heroin, cuz you are a fairly good-sized source of – for heroin right now in the – our area. You also have a very extensive crim history, a drug crim history, cuz I've checked. We've checked. Now you're looking at.. |
| Defendant: | I just told you I had drug history. |

(Id. at 13:45–14:45). The officers and Defendant continued their discussion. Defendant then asked the officers if they were recording him, and the officers did not acknowledge his question. (Id. at 16:45–17:15). The officers then continued their discussion with Defendant and, in response to SA Larson's question about how much heroin Defendant sold to a person named 'Jaymo,' Defendant stated the following:

| | |
|---|---|
| SA Larson: | How much did you sell him? |
| Defendant: | All right, check it out. Cuz I want to go home. I, what you all you need me to do, I'm gonna do, cuz my girl out there, she gonna go crazy if I don't. If she find out that I ain't trying to help, whatever I got going on, she's not going – or whatever. So whatever you all need me to do, I'm gonna do, I don't even care. I'm tired of playing games. I don't want to go to jail. I'm on probation. |

(Id. at 25:05–25:23). After the above exchange, Defendant continued to elaborate on his recent drug sales. Defendant then told the officers about the various cars he had been driving, which he indicated included a white truck, a gray Impala, a black pickup truck, and a Tundra. (Id. at 29:00–29:35).

Defendant then discussed other people he had previously provided drugs to, as well as, the various quantities that he had sold, and how often he delivered drugs. (Id. at 30:30–34:50). SA Skoog then asked Defendant for a DNA sample. Specifically, the following exchange took place:

| | |
|---|---|
| SA Skoog: | Are you willing to give me a DNA sample? |
| Defendant: | DNA sample for what, man? |
| SA Skoog: | What's that? I'm gonna – I'm gonna be asking the court otherwise for one, so it's up to you. I mean I'm just asking. |
| Defendant: | I give you one. |
| SA Skoog: | Okay. It's just.. |
| Defendant: | But you all got my DNA already. |
| SA Skoog: | I know, but I need it for – I need it for a certain, ah |
| Defendant: | [inaudible] |
| SA Skoog: | Yeah, and they only use it for the… |
| Defendant: | Yeah, what do I need to do, man? I don't want to go to jail. I'm here. I don't know what the fuck going on or what's going to happen, but I don't want to be in jail up here, man. I ain't gonna lie, man. Whatever you all need me to do, I'm – I'll do it, man. Let's – fuck that. |
| SA Larson: | How much – how much can you get? |
| Defendant: | Man, what do you want? Like I could get you whatever you want. Not from Minneap – it ain't coming from Minneapolis. I know some mother fuckers in Minneapolis with some – I know a dude with some fentanyl dope. If you want to get that shit or whatever – or whatever. I know another – I know two dudes with dope. |

(Id. at 36:00–36:50). The officers then asked Defendant about his passengers' involvement in the drug transactions, to which Defendant responded that they were involved. (Id. at 39:00–39:30). The officers subsequently asked Defendant if he had conducted drug transactions with several

6

different people, as well as, about other drug transactions he was aware of in the area. (Id. at 40:00–58:15).

The officers next discussed the money that was found on Defendant, as well as, the money that was found on the passengers in Defendant's car. (Id. at 58:30–1:02:00). Defendant then informed the officers about other drug transactions he had recently conducted in the area. (Id. at 1:02:30–1:09:30). At the end of the interview, the officers asked Defendant if they could talk to him again later in the morning, and Defendant told them that they could. (Id. at 1:10:00–1:12:00). In total, the first interview lasted an hour and thirteen minutes and concluded at approximately 1:50 a.m., on February 21, 2018.

Later, on February 21, 2018, SA Skoog and Special Agent Jim Osowski ("SA Osowski") conducted a second interview with Defendant that began at around 3:00 p.m. (Gov't Ex. 3). At the beginning of the interview, SA Skoog asked Defendant how he was doing, and Defendant told him that he had not been given any food or water since being arrested and that his stomach was hurting. (Id. at 0:30–1:00). Upon hearing this, SA Skoog told Defendant that he would get him some water. (Id. at 1:12–1:18). After this brief exchange, SA Skoog again read Defendant his Miranda rights. (Id. at 1:38–2:25). After reading Defendant his Miranda rights, the following exchange took place:

SA Skoog:         Having these rights in mind, are you willing to talk to us right now?

Defendant:       Yes.

SA Skoog:         Okay. Um just making sure that he's coming with your water.

Defendant:       Why the fuck man, man, this ain't right, man. Real fucking like super dehydrated. I ain't drunk no water.

SA Skoog:         Oh there he is.

SA Pinoniemi:   Took a minute to cool down.

SA Skoog:         Um.

7

| | |
|---|---|
| Defendant: | Oh, my God. |
| SA Skoog: | Feeling all right now? Better? You want some more? |
| Defendant: | Fucking cuz I might as well just fucking die, shit. That shit felt, man. |
| SA Skoog: | Okay. |
| Defendant: | Yeah, fucking feel – felt good. |

(Id. at 2:15–3:21). SA Skoog and SA Osowski then questioned Defendant about his cell phone.

(Id. at 3:21–6:50).

   After they discussed Defendant's cell phone, SA Skoog and SA Osowski began discussing

Defendant's charges with him. Specifically, the following exchange took place:

| | |
|---|---|
| Defendant: | Well I told you I was gonna do whatever I needed to do. |
| SA Skoog: | Okay and that's why – the – the reason why I'm talking to you is a controlled buy though in – as far as Minnesota law, it's – it's – it's ten – for a first degree it's ten or more grams within a 90-day period. So I could – potentially you could buy a half a gram at a time from you, as long as it's within 90 days and it – it equals, ah, ten grams or more, that's a first degree sale. |
| Defendant: | That's entrapment though. |
| SA Skoog: | No it isn't. No, no, it isn't. I'm just explaining. I mean we're.. |
| Defendant: | Yeah. |
| SA Skoog: | I'm not – I'm just telling you, that's – that's how – that's how it is. So, but so I mean, you know, that may change your mind a little bit on how, how buys are. You know, it doesn't have to be to the same person. |
| Defendant: | No buys though don't gotta be the same person, gotta – I know how it work. I mean noboday – I've never made – nobody never made a buy on me and I know people who try to make buys. When they make buys, um, they usually bust you right then, unless it's a federal type of bust. They don't – they just let you go or whatever. You know what I'm saying? So I know a lot about this shit already. |

| | |
|---|---|
| SA Skoog: | Okay. |
| Defendant: | Ain't no tricking me in none of that. I mean I – I know how to cooperate. |
| SA Skoog: | No, I'm – and I'm not trying to trick you. |
| Defendant: | I know – I know how to cooperate. I know not to cooperate. I know what to do, what not to do. I know how to – you know what I'm saying? |
| SA Skoog: | Yeah, I know. |
| Defendant: | I did this before. |
| SA Skoog: | Yeah, I'm not – I'm not.. |
| Defendant: | I don't want to go to jail. |

(Id. at 7:15–8:25).

The officers next asked Defendant about his knowledge of recent overdoses that had occurred in the area. (Id. at 8:30–16:30). The officers then continued to discuss Defendant's recent drug transactions with him:

| | |
|---|---|
| SA Skoog: | How many – how many grams do you think you've given or fronted over to Jaymo since you've known him? |
| Defendant: | Fronted or gave about 35. |
| SA Skoog: | And how much have you – how much has he bought? |
| Defendant: | How much he what? |
| SA Skoog: | How much has he bought from you? |
| Defendant: | Jaymo don't ever have no money…10 or 15 grams max. |
| SA Skoog: | So 50 total roughly? |
| Defendant: | Yeah. The thing you all – another thing is like you all doing this fed thing, right? The fed thing is like the add of how much dope, how much dope, how much dope over a certain amount of time, in |

> case I get charged, they charge me with all this fucking dope, 5-600 grams of heroin or whatever. That's why I didn't even want to say none of that. I could a just been like, no, I'm not saying none of that shit.

SA Skoog:    Okay.

Defendant:    I don't want to get charged with all this fucking heroin for all these days and days and days. Oh, we can charge him with this, we can charge him with that. When I could, you know what? Fuck it. Take me to jail. Give me PC, 36 hours PC and you see if I get charged. If I get charged, then I'll just take my chances. I'll bail – cuz I can bail out. Bail out, fight my case. I can do that.

(Id. at 19:10–8:25). The officers and Defendant then talked about Defendant's "girl." (Id. at 20:30–22:00). Defendant also told the officers about his cousin who he owes money to. (Id. at 23:30–24:15). The second interview concluded at around 3:51 p.m. and lasted for approximately 43 minutes.

Throughout the two interviews, the officers maintained a conversational tone and made no threats or promises to Defendant. Although Defendant became somewhat emotional at times during the second interview, Defendant also maintained a conversational tone, and he was cooperative throughout the interview and showed a willingness to cooperate with the officers. Defendant also responded appropriately to the questions presented. In sum, Defendant's two interview lasted for a little less than two hours.

## II.    DEFENDANT'S MOTION TO DISMISS INDICTMENT. [DOCKET NO. 24].

Defendant first moves the Court for an Order dismissing his Indictment. (Def.'s Mot. To Dismiss Indictment [Docket No. 24]). In his Motion, Defendant requests the Court dismiss the Indictment in its entirety for lack of probable cause and on the basis that the Indictment was supported by unreliable information submitted to the Grand Jury.

10

### A.  Standard of Review

Rule 7(c)(1) of the Federal Rules of Criminal Procedure states that an "indictment [ ] must be a plain, concise, and definite written statement of the essential facts constituting the offense charged. . ." The character of the evidence considered by the grand jury does not affect the validity of the indictment. United States v. Cassandra, 414 U.S. 338, 344–45 (1974). And it is well-settled that an indictment is not subject to attack based on sufficiency of the evidence presented to the grand jury. United States v. Nelson, 165 F.3d 1180, 1182 (8th Cir. 1999) (citing Costello v. United States, 350 U.S. 359, 363–64 (1956)).

### B.  Analysis

Defendant argues that while the indictment "gives [him] an idea of the general time of the alleged offense and the language of the statute that creates the offense, . . . it utterly fails to account for the underlying evidence necessary to prove the charge." (Def.'s Mem., [Docket No. 24], at 3). Specifically, Defendant argues that the evidence is insufficient because the confidential informant was unreliable; the Government does not have evidence to support its allegation that Defendant conspired to distribute more than 100 grams of heroin; and Defendant's statements were inadmissible because they were made under duress. (Def.'s Mem., [Docket No. 24], at 4–6). Defendant, however, does not dispute that the language of the indictment was "plain, concise, and [a] definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Rather, Defendant solely disputes the sufficiency of the evidence underlying the Indictment.

As explained above, an indictment is not subject to attack based on the sufficiency of the evidence. Therefore, the Court recommends **DENYING** Defendant's Motion to Dismiss Indictment. [Docket No. 24].

III.    **DEFENDANT'S MOTION TO SUPPRESS STATEMENTS. [DOCKET NO. 25].**

Defendant next moves the Court for an Order suppressing the statements he made during the two interviews on February 21, 2018. (Def.'s Mot. to Suppress Statements [Docket No. 25]).

In his memorandum in support of the present Motion, Defendant argues that the statements he gave during the two custodial interrogations should be suppressed "on the grounds that they were not obtained in a free and voluntary manner." (Def.'s Mem. [Docket No. 37]). Specifically, Defendant contends that he did not provide a valid waiver of his Miranda[4] rights prior to either of the interrogations because of the conditions of his confinement, the manner that the officers asked questions, and because he had used marijuana prior to his arrest. (Def.'s Mem., [Docket No. 31], at 6). Therefore, Defendant argues, the statements he made on February 21, 2018, should be suppressed. (Id.).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an

---

[4] Miranda v. Arizona, 384 U.S. 436 (1966).

12

incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

A defendant may waive their rights, "provided the waiver is made voluntarily, knowingly and intelligently." Miranda, 384 U.S. at 444.

### B. Analysis

As noted above, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury, 511 U.S. at 322 (quoting Miranda, 384 U.S. at 444). To be subject to suppression under Miranda, a statement must be made while in custody and in response to interrogation. United States v. McGlothen, 556 F.3d 698, 701 (8th Cir. 2009) (citing United States v. Londondio, 420 F.3d 777, 783 (8th Cir. 2005)).

It is undisputed that law enforcement's express questioning of Defendant on February 21, 2018, constituted interrogation. It is also undisputed that Defendant was in custody during the February 21, 2018, interview when he made the statements he now seeks to suppress. (See, Def.'s Mem., [Docket No. 31], at 5) ("It is undisputed that Defendant was in custody; Detective Skoog repeatedly reiterated this. It is indisputable, then, that both times Defendant spoke with Detective Skoog constituted custodial interrogations."). The record also clearly demonstrated that Defendant was read a Miranda warning before both interviews began, and he verbally acknowledged that he waived his rights pursuant to Miranda.

Accordingly, the only issue now before the Court regarding Defendant's February 21, 2018, interviews is whether Defendant's waiver of his rights was made intelligently, knowingly, and voluntarily.

Before a statement procured through custodial interrogation can be admitted in court, the Government must demonstrate that a defendant's wavier of his rights was made intelligently, knowingly, and voluntarily. <u>Miranda</u>, 384 U.S. at 444, 475. The validity of a <u>Miranda</u> waiver requires consideration of two distinct inquiries, namely whether the waiver was voluntary "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[,]" and whether the waiver was knowingly and intelligently made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." <u>United States v. Vinton</u>, 631 F.3d 476, 483 (8th Cir. 2011) (internal citations omitted) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)). "The government has the burden of proving the validity of the <u>Miranda</u> waiver by a preponderance of the evidence." <u>United States v. Haggard</u>, 368 F.3d 1020, 1024 (8th Cir. 2004).

### 1. **Voluntariness**

Courts assess whether a waiver of rights pursuant to <u>Miranda</u> was made voluntarily by considering "the conduct of law enforcement officials and the suspect's capacity to resist any pressure." <u>United States v. Contreras</u>, 372 F.3d 974, 978 (8th Cir. 2004). The United States Supreme Court has previously explained "that coercive police activity is a necessary predicate to . . . finding that a confession is not 'voluntary,'" <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986), and the Eighth Circuit has read that holding to mean "that police coercion is a necessary prerequisite to a determination that a waiver was <u>involuntary</u> and not as bearing on the separate question whether the waiver was knowing and intelligent." <u>United States v. Turner</u>, 157 F.3d 552, 555 (8th Cir. 1998) (quoting <u>United States v. Bradshaw</u>, 935 F.2d 295, 299 (D.C. Cir. 1991)).

In determining whether a waiver was made voluntarily, a court "looks at the totality of the circumstances and must determine whether the individual's will was overborne." <u>United States v.</u>

14

Syslo, 303 F.3d 860, 866 (8th Cir. 2002). In considering the totality of the circumstances, a court reviews whether the statement was "extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired." United States v. Sanchez, 614 F.3d 876, 883 (8th Cir. 2010) (internal quotation marks and citations omitted). "More specifically, [a court] consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition." Id. (citing Sheets v. Butera, 389 F.3d 772, 779 (8th Cir. 2004)).

Defendant argues that his waiver of rights pursuant to Miranda was not voluntary because the conditions of his cell caused Defendant's will to be "overborne by the lack of basic human necessities." (Def.'s Mem., [Docket No. 37], at 6–7). Specifically, Defendant contends that the fact that the water in his cell was shut off and that he had not eaten since being arrested caused his will to be overborne. (Id.). Defendant also contends that Defendant was "deceived by the sheer confusion that surrounded the situation," and that there was "no indication that Defendant appreciated the rights he was giving up in his quest to determine why he had been arrested." (Id.).

The Court's independent review of the audio recording of both of the February 21, 2018, interviews indicates that the officers did not engage in any threatening or coercive tactics. See, United States v. Mims, 567 F. Supp. 2d 1059, 1080 (D. Minn. 2008) (holding Miranda waiver voluntary where, among other factors, interview was conducted in a reasonable, conversational tone); see also, United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (concluding no coercive tactics were used where, among other things, officers made no threats or promises to the defendant).

The Court finds Defendant's assertion that his will was overborne by the conditions of his confinement because the water to his cell was shut off unpersuasive, as the assertion is unsupported by the factual record now before the Court. According to Defendant, the water to his holding cell was shut off from the time he first arrived at the Becker County Sheriff's Office to at least the conclusion of his second interview with the officers. Defendant alleges that this resulted in him being unable to drink water or go to the bathroom for the pendency of his confinement at the Becker County Sheriff's Office.

There is, however, no indication in the record that the water to Defendant's cell was shut off as part of an overt effort of extracting a statement from him. Furthermore, even if the Court assumes that the conditions of Defendant's holding cell were as bad as Defendant alleges, there is no indication that the interrogating officers were aware that the water in Defendant's cell was off during the time he was at the Becker County Sheriff's Office. While SA Skoog acknowledged that the water to a cell is occasionally shut off temporarily so that individuals' persons can be searched, he stated he had no recollection of that occurring in this case. Instead, according to the record, the ability to control the conditions of an individual cell rests with the jail staff with the exception of the ability to limit whether jailed individuals can make phone calls.

Notably, at no point during either of his custodial interrogations did Defendant inform the officers that the water to his cell was shut off or that he believed the conditions in his cell were inhumane. Rather, during his second interview with the officers, Defendant informed them that he was thirsty, and the officers got him water and subsequently offered him more water later on. This shows that Defendant was able to request things that he wanted and that the officers would oblige his requests.

16

Defendant also argues that he "had no capacity to resist the pressure exerted" by SA Skoog because "Defendant did not understand what was going on." (Def.'s Mem., [Docket No. 37], at 8–9). Defendant also argues that Defendant's custodial interrogations were "intense and repetitive." (Id. at 9). This, however, is unsupported by the audio recording.

Throughout the interviews, SA Skoog, SA Larson, and SA Osowski maintained a conversational tone and made no threats or promises to Defendant. Further, the Court's review of the audio recording of the interviews shows that Defendant spoke willingly, understood what was being asked of him, responded appropriately to the question presented, asked questions of his own, highlighted his prior interactions with law enforcement, and resisted accusatory questions. Nothing in the record now before the Court indicates that anything about Defendant's maturity, education, physical condition, or mental condition critically impaired Defendant's capacity for self-determination.

Based on the foregoing, and under the totality of the circumstances, the Court concludes that Defendant's waiver of his rights during both custodial interrogations on February 21, 2018, was voluntary.

## 2. **Knowing and Intelligent**

Next, the Court must consider whether Defendant's waiver of his rights was knowingly and intelligently made. Vinton, 631 F.3d at 483. The evidence in the record regarding Defendant's understanding of his rights and presence of mind during the February 21, 2018, interviews consists of the audio recording of the interview and the testimony of Defendant, as well as, the testimony of SA Skoog.

Defendant argues that his statements from the first interview should be suppressed because he had smoked marijuana earlier in the day.

A defendant's intoxication, in certain circumstances, can invalidate a waiver of rights pursuant to <u>Miranda</u>; however, the Eighth Circuit has "declined to adopt a per se rule of involuntariness when confronted with intoxication." <u>Makes Room</u>, 49 F.3d at 415. Rather, the Eighth Circuit requires an evaluation of whether, in spite of intoxication, "the evidence shows that [the defendant] understood his rights and knowingly waived them." <u>Turner</u>, 157 F.3d at 556.

In <u>Turner</u>, the Eighth Circuit found that although a urinalysis showed the defendant was under the influence of the drug PCP, his behavior at the time of his confession showed he had the mental capacity to waive his rights, including his giving a false name to evade identification, as well as, his ability to later give all his correct identification information, to recall the name and contact information of the owner of the car he was driving, and to provide officers with a narrative of his actions with his reasons for doing them. <u>Id.</u> The court in <u>Turner</u> relied on the fact that the defendant was cooperative, reviewed and initialed a waiver form, responded to questions, and gave accurate information in finding that he had sufficient mental capacity to waive his rights. <u>Id.</u> The Court also noted that the defendant "acted in a manner more consistent with a person attempting to avoid being caught than a person who did not know what he was doing." <u>Id.</u> at 555.

In <u>United States v. Casal</u>, the defendant had used methamphetamine the evening of his interrogation and had not slept in five days. 915 F.2d 1225, 1227 (8th Cir. 1990). The Court rejected the defendant's argument that his statements were involuntary because of his recent methamphetamine drug use and lack of sleep, finding that there "was evidence that [the defendant] did not act like an intoxicated person" and that the defendant demonstrated an ability to say "no" to the officers when he did not want to speak on a particular subject. <u>Id.</u> at 1229. The Court specifically noted that the testimony established that defendant "did not appear to be intoxicated

and talked coherently (indeed, [the defendant] refus[ed] to comply with various police requests)." Id.

In Contreras, the defendant informed the interviewing police officers, and a separate witness testified at the suppression hearing, that the defendant had "used methamphetamine the night before [his arrest and interview] and had used marijuana the day of [it]." United States v Contreras, 372 F.3d 974, 977 (8th Cir. 2004). In rejecting the defendant's argument that his consent to the search of his home and the statement he made were not voluntary, the Court relied on testimony from the officers that the defendant "appeared to be sober and in control of his faculties at the time he consent[ed]" and on the fact that substantial evidence showed he "was lucid at the time he gave consent and that he understood the questions asked of him." Id. at 977–78.

In the present case, the Government offers sufficient evidence for the Court to determine that Defendant's waiver of his rights on February 21, 2018, was knowing and intelligent. Although Defendant was potentially under the influence of marijuana at the time of his first interrogation, the officers did not believe that Defendant acted in an intoxicated manner. The evidence rather, clearly shows that Defendant understood his rights and knowingly waived them. Specifically, Defendant repeatedly emphasized his desire to cooperate with the officers in order to avoid going back to jail. Additionally, Defendant gave false information to the officers on multiple occasions which shows that he "was lucid at the time he gave consent and that he understood the questions asked of him." Contreras, 372 F.3d at 977. Lastly, Defendant told the officers that he was willing to speak with them a second time at the conclusion of his first interview.

Considering the totality of the circumstances, the Court's independent review of the audio recording of the February 21, 2018, interview indicates that Defendant appeared to fully

19

comprehend the conversation, understood the situation, understood the questions being asked of him, and provided contextually appropriate answers.

Therefore, under the totality of the circumstances—including the consideration of Defendant's own actions and words—the Court concludes that Defendant's waiver of his rights at each of the February 21, 2018, interviews were also knowing and intelligent.


## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein,


**IT IS HEREBY RECOMMENDED THAT**:

1. The Court recommends that Defendant's Motion to Dismiss Indictment, [Docket No. 24], be **DENIED**; and

2. Defendant's Motion to Suppress Defendant's Statements, [Docket No. 25], be **DENIED**.


Dated: September 19, 2018                     s/Leo I. Brisbois
                                              Leo I. Brisbois
                                              U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.